AO 106 (Rev. 04/10)  Application for a Search Warrant (Modified: WAWD 2-12-2020)

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Information associated with One (1) Target | ) | Case No.  **MJ24-232** |
| Accounts/Identifiers (TT2), for Investigation of | ) | |
| 21 U.S.C. § 841 & 846 and Other Offenses | ) | |

## APPLICATION FOR A SEARCH WARRANT AND PEN-TRAP ORDER

I, a federal law enforcement officer or an attorney for the government, request a search warrant and pen-trap order, and state under penalty of perjury that I have reason to believe that on the person or property described in Attachment A, located in the Western District of Washington and elsewhere, there is now concealed property and evidence described in Attachment B. This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

The basis for the search under Fed. R. Crip P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841 & 846 | Possession with Intent to Distribute, Distribution of, and Conspiracy to Distribute Controlled Substances |
| 21 U.S.C. § 924(c) | Use of a Firearm During a Crime of Violence or Drug Trafficking Crime |

The application is based on the facts set forth in the attached affidavit, which is incorporated herein by reference with all attachments and exhibits.  Pursuant to 18 U.S.C. § 3123(a)(1), Exhibit 1 to the affidavit includes a certification from an attorney from the government that the requested information is relevant to an ongoing criminal investigation.

Pursuant to Fed. R. Crim. P. 41, this warrant is presented by:

☒ by reliable electronic means; or ☐ telephonically recorded

_____
*Applicant's signature*

Allana Kleinosky, Special Agent FBI
*Printed name and title*

☐ The foregoing affidavit was sworn before me and signed in my presence, or

☒ The above-named officer provided a sworn statement attesting to the truth or the foregoing affidavit by telephone.

Date: March 9, 2022

_____
*Judge's signature*

Paula L. McCandlis, United States Magistrate Judge
*Printed name and title*

City and state: Seattle, Washington

USAO 2024R00052

**ATTACHMENT A**

**Property to Be Searched and Subscriber/Subject Information**


Records and information associated with the following cellular telephones

a.  **Target Telephone 2 (TT2),** with number 443-653-7914 (hereinafter "**TT2**") with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.  The listed subscriber is Abi Solomon and the billing address is 3 Brookeberry Drive, Apartment C1, Nottingham, MD 21236.


In Attachment B, T-Mobile is referred to as the Wireless Provider.

ATTACHMENT B

**Particular Things to Be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701- 2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127. As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Telephone described in Attachment A. This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8). Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.    **Section I:  Information to be Disclosed by as the Wireless Provider**

1.    **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A:

a.    Names (including subscriber names, user names, and screen names);

b.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.    Local and long distance telephone connection records for the last 60 days or two billing cycles, whichever is longer;

d.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for the past 60 days or two billing cycles, whichever is longer;

e.    Length of service (including start date) and types of service utilized;

f.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

g.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.      Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.      **Prospective Cell Site Location Information.**

a.      All information about the location of the Target Telephone described in Attachment A for **a period of 45 days from activation**, during all times of day and night.  This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A**.**

3.      **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.      All information about the location of the Target Telephone described in Attachment A for **a period of 45 days**, during all times of day and night.  This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of the Wireless Provider.  The Wireless Provider is required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), the Wireless Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Wireless Provider's services.  The government shall compensate the Wireless Provider for reasonable expenses incurred in

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

furnishing such facilities or assistance.

**II.     Section II:  Information to Be Seized by the Government**

1.      All information described above in Section I that will assist in investigating unidentified subjects who are engaged in violating 21 U.S.C. §§ 841(a)(1), and 846.

2.      All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.      Location Information regarding the Target Telephone described in Attachment A.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Wireless Provider in order to locate the things particularly described in this Warrant.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**AFFIDAVIT**

STATE OF WASHINGTON      )

                                     )      ss

COUNTY OF KING      )

       I, Allana Kleinosky, a Special Agent with the Federal Bureau of Investigation, Seattle, Washington, being first duly sworn, hereby depose and state as follows:

**PURPOSE OF THIS AFFIDAVIT**

       1.     I make this Affidavit in support of a warrant pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the following cellular telephone:

       a.     **Target Telephone 2 (TT2),** with number 443-653-7914 (hereinafter "**TT2**") with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054. The listed subscriber is Abi Solomon and the billing address is 3 Brookeberry Drive, Apartment C1, Nottingham, MD 21236. The user of the phone is believed to be Samuel Olusegun Solomon. **TT2** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

       2.     Based on the facts set forth in this Affidavit, I submit that there is probable cause to believe that Samuel Olusegun Solomon ("Solomon"), and others, committed crimes in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Possession with Intent to Distribute, Distribution of, and Conspiracy to Distribute Controlled Substances), and 18 U.S.C. § 924(c) (Use of a Firearm During a Crime of Violence or Drug Trafficking Crime), and that Solomon is currently using **TT2.** Obtaining location and other information for these instrumentalities will further this investigation.

       3.     This is the first federal application for a tracking warrant and pen register for **TT2** in this judicial district in connection with this investigation.

# PEN REGISTER ACT

4.      Because this warrant seeks the prospective collection of information that falls within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to comply with the Pen Register Act, 18 U.S.C. §§ 3121-3127.

5.      The Court has jurisdiction to issue the requested pen-trap order because it is a "court of competent jurisdiction" under 18 U.S.C. § 3122(a)(2). Specifically, the Court is a district court of the United States that "has jurisdiction over the offense being investigated." 18 U.S.C. § 3127(2)(A)(i).

6.      This application includes all the information required by the Pen Register Act. *See* 18 U.S.C. §§ 3122(b) & 3123(a)(1). Namely, Exhibit 1 to this application is a certification from Assistant United States Attorney Stephen Hobbs that (1) identifies the FBI as the law enforcement agency conducting the investigation and (2) certifies the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency. 18 U.S.C. § 3122(b). The Assistant United States Attorney is an "attorney for the government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure.

7.      A "pen register" is "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted." 18 U.S.C. § 3127(3). A "trap and trace device" is "a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication."  18 U.S.C. § 3127(4).

8.      In the traditional telephone context, pen registers captured the destination phone numbers of outgoing calls, while trap and trace devices captured the phone numbers of incoming calls. Similar principles apply to other kinds of wire and electronic communications such as emails, text messages, connection logs, and data transfers. The prospective location data sought in this application constitutes "dialing, routing,

Affidavit of SA Kleinosky - 2
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

addressing, and signaling information" covered by the Pen Register Act.  Accordingly, the requested warrant will record, decode, and/or capture dialing, routing, addressing, and signaling information associated with the Target Cell Phone without geographic limit.

9.      The United States further requests, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), that the Court order through Attachment B of the requested warrant that AT&T and any other person or entity providing wire or electronic communication service in the United States whose assistance may facilitate execution of this warrant furnish, upon service of the warrant, information, facilities, and technical assistance necessary to install the pen/trap, including installation and operation of the pen-trap unobtrusively and with minimum disruption of normal service.  Any entity providing such assistance shall be reasonably compensated by the HSI, pursuant to 18 U.S.C. § 3124(c), for reasonable expenses incurred in providing facilities and assistance in furtherance of the warrant.

10.     **Through this application, the United States does not request and does not seek to obtain the contents of any communications, as defined in 18 U.S.C. § 2510(8).**

## AGENT BACKGROUND

11.     I am employed as a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been employed with the FBI since May 2019. I am currently assigned to the violent crime, gang, and transnational organized crime squad in the Seattle, Washington Division. As an FBI Special Agent, I have been trained to investigate a variety of crimes, including cases involving violations of Title 18 and 21 of the United States Code. I have conducted many investigations, drafted search warrants, tracking warrants, and other such legal process in furtherance of investigations.

12.     Prior to my role as a Special Agent for the FBI, I was an Air Marshal with the Federal Air Marshal Service for three years and a Customs and Border Protection Officer with Customs and Border Protection for over three years. During my time as a Customs and Border Protection Officer and Federal Air Marshal, I participated in many arrests, seizures, and other law enforcement actions.

Affidavit of SA Kleinosky - 3
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

13.     As a Customs and Border Protection Officer, I was highly trained in all aspects of the trafficking of narcotics. I have received training including, but not limited to, drug identification, drug interdiction, drug trafficking, drug smuggling, and money laundering techniques. I am well versed on individuals and/or organizations who are involved in the illegal possession, possession for sale, sales, importation, smuggling, manufacturing, and trafficking of controlled substances. This includes the trafficking of controlled substances internationally by way of the United States borders. I have seized or participated in the seizure of hundreds of pounds of narcotics. I am familiar with the various trends, materials, tools, methods, and paraphernalia used by traffickers in import, concealment, and distribution of narcotics.

14.     The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

15.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 and Title 21 of the United States Code have been committed, are being committed, and will be committed by Samuel Olusegun Solomon, Aaron Thompson, and Carlton Pierre Mitchell. There is also probable cause to believe that the location information described in this Affidavit and in Attachment B will constitute evidence of these criminal violations and will assist in the location of other individual who are engaged in the commission of these offenses.

16.     **STATEMENT OF PROBABLE CAUSE**

November 2-3, 2022: Shooting death of Tre'El Johnson.

17.     On November 3, 2022, at approximately 12:34 a.m., Seattle Police Officers responded to a 911 call for gunshots fired at 5231 17th Avenue SW, Seattle, Washington

Affidavit of SA Kleinosky - 4
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

("**the residence**"). Inside the single-story residence, officers found Tre'El Johnson bleeding, unresponsive, and unconscious on the floor of the living room. Officers attempted CPR, but Johnson was pronounced dead at the scene.

18.     An autopsy performed by the King County Medical Examiner's office's classified the death as a homicide, with death caused by a single penetrating gunshot wound that entered the middle of the back into the torso. The gunshot penetrated from back to front, left to right, and upward damaging multiple internal organs to include the heart and right lung. A single bullet was recovered from Johnson's abdomen.

19.     For the reasons summarized below, investigators believe that Johnson was shot and killed during a narcotics transaction and that the following individuals were present in the residence at the time of the shooting and are suspects in the homicide:

| Name | Associated Phone Number | TT Number |
|------|------------------------|-----------|
| Samuel Olusegun Solomon | 443-622-5523 | TT1 |
|  | 443-653-7914 | **TT2** |
| Carlton Pierre Mitchell | 323-718-5242 | TT3 |
| Aaron Thompson | 347-361-0938 | -- |

November 2-3, 2022: 911 Call and observations of neighbor.

20.     At approximately 12:22 a.m. on November 3, 2022, neighbor, T.P. called 911 to report hearing gunshots. In a later interview, T.P. stated that he heard approximately four or five loud banging noises that sounded like gunshots. T.P. looked outside and observed two males running from **the residence** to a back yard adjacent to **the residence**. They appeared to have jumped over the fence into the adjacent neighbor's property (5228 18th Avenue Southwest). T.P. could hear them speaking loudly. The men then returned to **the residence** property. One of the males ran into **the residence**. The other male said "hurry up, hurry up, lets go." The first male then exited **the residence** with a large plastic bag that appeared to be heavy. The two men placed the bag into a black vehicle parked in the gravel at **the residence**. Both men returned inside **the**

Affidavit of SA Kleinosky - 5
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  **residence** and exited with more black plastic bags they put in the vehicle. The two men
2  entered the vehicle and drove off. T.P. could hear a person moaning in **the residence**.

3      21.    T.P. believed the two men were black men. One of the males may have
4  been wearing gray and black; the second male appeared to be wearing all dark (possibly
5  black) clothing.  T.P. believed **the residence** was used a rental property on Airbnb.
   Information related to Airbnb rental.

6      22.    Investigators located the owner of **the residence** and determined **the**
7  **residence** had been used as an Airbnb rental and was rented out at the time of the
8  homicide. The returns from search warrant 22-0-62545-0 (B), signed by Judge Brian
9  McDonald of the King County Superior Court on November 5, 2022, showed that the
10 Airbnb was rented by Carlton Mitchell. Mitchell's account was associated with phone
11 number 323-718-5242 and had a copy of Mitchell's Virginia Driver's License. **The**
12 **residence** was rented for check-in on November 2, 2022, and checkout on November 3,
13 2022.

14     23.    Investigators contacted the owner of **the residence,** A.P, who stated that the
15 Airbnb was reserved for two guests, with check-in allowed between 6:00-8:00 p.m.

16     24.    The Airbnb co-host, D.V. told investigators that she texted phone number
17 323-718-5242 with a welcome message, instructions to access the home, and house rules.
18 **The residence** had an electronic lock requiring a code. The code is set for each
19 reservation individually as the last four digits of the renter's phone number.

20     25.    A.P. also provided investigators with a history of the electronic lock system
21 for **the residence**. The door was unlocked at approximately 9:36 p.m. on November 2,
22 2022, with Mitchell's access code. At approximately 9:37 p.m., the lock was locked. The
23 lock was manually locked/unlocked several times throughout the evening with a final
24 lock at 11:32 p.m. The lock was unlocked again at approximately 12:18 a.m. on
   November 3, 2022.

25 Retrieval of video evidence.

26     26.    A.P. provided investigators with video from the motion activated Ring
27 video doorbell located at the front door of **the residence**. The video contains audio and

Affidavit of SA Kleinosky - 6
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  captures the front entry area, the driveway, and the garage door.[1] The video contains time

2  and date stamps.[2] Based on my training and experience, I know that motion activated

3  cameras, such as Ring cameras, do not record continuously, therefore the footage that is

4  recorded does not capture all events or action that occur in front of the door or in the

5  driveway. The footage that was captured provided snapshots of the events that occurred

   on November 2, 2022, and into the early hour of November 3, 2022.

6        27.    Investigators also obtained continuous surveillance video footage from

7  W.H. at 5224 17th Avenue Southwest, Seattle, Washington. 5224 is located on 17th Ave

8  across from **the residence.**[3] Cam3 had a direct view of 17th Ave and the entrance of the

9  driveway of **the residence**. Cam4 had a direct view of the entry stairs to 5224 and a

10  partial view of 17th Avenue.

11       28.    The following is a summary of events[4] seen on the Ring camera, Cam3, and

12  Cam4:

13       29.    On November 2, 2022, at approximately 9:34 p.m., a black/dark SUV

14  arrived at **the residence** with the male in gray sweatpants and sweatshirt (believed to be

15  UM1). UM1 parked the SUV so that it was backed in towards the fence on the south side

16  of the driveway. UM1 accessed the trunk of the SUV.

17  //

18  //

    //

19

20

21  _____

22  [1] Investigators obtained a search warrant, 22-0-62545-0 (A) signed by Judge Brian McDonald of the King County
    Superior Court, on November 5, 2022, for all video footage recorded by Ring for the date and time of the incident.
    The footage provided was the same as provided by A.P, no additional content was available.

23  [2] The video time and date stamps appear consistent with other documented time and date markers for the event such
    as 911 calls and police reports.

24
    [3] The date stamp for the cameras is accurate but the time stamps appear to be approximately 5 minutes ahead of the
25  time stamps for the previously discussed Ring cameras. For example: Cam3 shows 9:39 p.m. and the Ring camera
    shows 9:34 p.m. for the arrival of the Black SUV. The photos of Cam3 and Cam4 will appear approximately 5
26  minutes ahead of the believed correct time.

    [4] The timeline summaries will make an approximate 5-minute adjustment for Cam3 and Cam4 to be consistent with
27  the time matching the Ring camera and police reports (and believed to be true time of these events).

Affidavit of SA Kleinosky - 7
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19
20



21

30.     At approximately 9:59 p.m., a SUV/Van parked in front of the residence

22 but then relocated further south down 17th Ave where through the trees, the lights could

23 be seen stopping. The stopped lights lead investigators to believe that the vehicle parked.

24 Then at approximately 10:02 p.m., two individuals, one male (UM3) wearing a

25 dark/black sweatshirt with the hood up, dark/black pants, reflective shoes, what appeared

26 to be a medical face mask, and carrying paper grocery type bag and the second male

27 (believed to be UM2) wearing camouflage pants, dark shoes, a black sweatshirt, a bucket

Affidavit of SA Kleinosky - 8
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

hat, what appeared to be a medical mask, carrying a cardboard box and a grocery bag walked from the area of the parked car, walked down the driveway of **the residence**, and entered the side gate of **the residence**.





Affidavit of SA Kleinosky - 9
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          31.     At approximately 11:10 p.m., a male (believed to be UM2) wearing a

2  sweatshirt with the hood pulled up over his head and partially covering his face exited

3  **the residence** front door and stood in front of the window. At the same time, a truck

4  backed down the driveway of **the residence.**





          32.     At approximately 11:14 p.m., victim Johnson, wearing a gray sweatshirt

and tan pants exited the front door of **the residence** and walked to the driver side of a

Affidavit of SA Kleinosky - 10
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

truck[5] parked in the driveway. Johnson then returned to **the residence**. At approximately 11:32 p.m., Johnson exited **the residence** and accessed the tailgate part of the truck bed. Johnson pulled a large black plastic garbage bag from the truck bed. The tailgate was left open. Johnson returned to **the residence** with the bag and what appeared to be a phone in his right hand.





33.     At approximately 12:18 a.m., a male (believed to be UM3) could be seen running from **the residence**, up the driveway, and south on 17th. Lights could then be

---

[5] Investigators later identified the truck as a 2002 Chevrolet Avalanche belonging to Johnson.

Affidavit of SA Kleinosky - 11
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

seen from where investigators believe the SUV/Van was parked and where UM3 was seen walking upon his arrival. At the same time, multiple gunshots could be heard, then music playing from **the residence**.





Affidavit of SA Kleinosky - 12
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8

34.    At approximately 12:20 a.m., UM1, wearing a blue skull cap, was at the front door and waved to UM2 wearing a red do-rag indicating for UM2 to come towards him. At approximately 12:21 a.m., UM2 carried two large black plastic garbage bags in one hand and a package in the other. He dropped the black bags, then began dragging one of the bags to the SUV parked in the gravel. UM1 exited **the residence** with tan boxes in his arms and ran to the SUV. He opened the trunk of the SUV and put the boxes inside. UM2 then ran toward **the residence**. A male voice could be heard saying "Come on man" from inside **the residence**. Other voices or audio could be heard from inside **the residence**.

9
10
11
12
13
14
15
16
17
18



19  //
20  //
21  //
22
23
24
25
26
27

Affidavit of SA Kleinosky - 13
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27





Affidavit of SA Kleinosky - 14
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10



11  35.    At approximately 12:23 p.m., the SUV backed up slightly. The SUV then

12  backed up again and pulled forward towards the driveway. The SUV exited the driveway

13  of **the residence**.

14
15



16
17
18
19
20
21
22

23  36.    Cam3 and Cam4 recorded continuously between the arrival of the

24  black/dark SUV and departure of the black/dark SUV. Video footage did not capture any

25  other persons, aside from UM1, UM2, UM3, and the victim, arriving to or exiting the

26  driveway of **the residence** or property of **the residence** from 17th Avenue. The Ring

27  footage did not capture any other persons, aside from UM1, UM2, UM3, and the victim,

Affidavit of SA Kleinosky - 15
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

arrive to or exit **the residence** before, during, or after the discharge of the firearm. The interview of T.P. is consistent with what could be observed on the Ring camera and Cam3. Two males were moving around the exterior of the residence after the time of the firearm discharge and then no one was seen after the exit of the black/dark SUV.

37.    As a result of the totally of the video footage and interview, investigators believe that three males (UM1, UM2, UM3), other than the victim, were in **the residence** at the time of the homicide. Investigators also believe that the same males left the residence after the after the crime occurred with UM3 exiting as shots were being fired. Investigators do not believe that others were present at the time of the crime.

Evidence Seized from the Residence.

38.    After search of **the residence** by law enforcement and crime scene investigators, multiple pieces of evidence were found and seized. Some of those items included:

Item 1: One spent cartridge with headstamp " WIN 9mm Luger+P"

Item 2: One Boneyard Beer Can. Note: the Boneyard beer can was found in the living room on a coffee table. Latent print examination found two latent prints belonging to Mitchell on the can.

Item 3: DNA swab from item 2

Item 4: Blue disposable surgical mask

Item 8: One spent cartridge with headstamp "SIG 9mm Luger"

Item 9: One spent cartridge with headstamp "SIG 9mm Luger"

Item 10: One spent cartridge with headstamp "Hornady 9mm Luger"

Item 11: One spent cartridge with headstamp "Hornady 9mm Luger"

Item 12: Pure Leaf Tea Bottle. Note: The bottle was found in the dining room of **the residence**. It was tested for latent fingerprints and a fingerprint belonging to Solomon was found on the bottle.

Item 14: One spent cartridge with headstamp "SIG 9mm Luger"

Item 17: One spent cartridge with headstamp "SIG 9mm Luger"

Item 18: One spent cartridge with headstamp "Hornady 9mm Luger"

Item 19: One spent cartridge with headstamp "SIG 9mm Luger"

Item 20: One spent cartridge with headstamp "SIG 9mm Luger"

Affidavit of SA Kleinosky - 16
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Item 21: One spent cartridge with headstamp "SIG 9mm Luger"

Item 22: One Boneyard Beer Can. Note: The Boneyard beer can was found in on the kitchen counter of **the residence**. The beer can was swabbed for DNA and a DNA profile was identified as belonging to Aaron Thompson.

Item 24: One Boneyard Beer Can. Note: The Boneyard beer can was found in in a trash can in **the residence**. The beer can was swabbed for DNA and the major contributing DNA profile was identified as belonging to Aaron Thompson.

Item 27: One spent cartridge with headstamp "Blazer 9mm Luger"

Item 28: One Boneyard Beer Can. Note: The Boneyard beer can was found in a bathroom attached to the master bedroom on the counter. The beer can was swabbed for DNA and a DNA profile was identified as belonging to Aaron Thompson

Item 35: Stemless Wine Glass. Note: The wine glass was found on the fireplace mantle in the living room of **the residence.** Two of Mitchell's latent prints were identified on the glass.

Item 39: Fired Bullet Fragment

Item 43: Fired Bullet Fragment

Item 44: Fired Bullet Fragment

Item 45: Fired Bullet Fragment

Item 46: Fired Bullet

Item 48: Plastic takeout bag with sushi. Note: The plastic bag was found in the living room of **the residence**, on the floor near the ottoman. Latent fingerprint examination determined that a latent print on the bag was identified as belonging to Thompson.

Item 49A/B: Two white trash bags. Note: The white trash bags were found with one inserted inside of the other in the living room on the couch. On one of the bags, item 49A, latent print examiners found a latent print belonging to Solomon.

Item 50: Two black trash bags

Item 51: Zip Ties

Item 60 A/B: .45 caliber Ruger handgun, serial 08650 and magazine. Note: The .45 caliber Ruger was found in **the residence**, in the kitchen, in a cabinet above the stove and microwave. The Ruger was loaded with seven rounds in the inserted magazine and no round in the chamber. Investigators confirmed that the firearm had been reported stolen from a personal residence in Houston Texas on November 23, 2021. The firearm was tested for latent fingerprints. A fingerprint from Solomon, was found on both the Ruger (60A) and the magazine (60B) from the Ruger.

Affidavit of SA Kleinosky - 17
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Items 61 & 62: Two vacuum sealers. Note: The vacuum sealers were found in **the residence** on the kitchen counter. The vacuum sealers were tested for latent fingerprints. On item 62, latent fingerprint examiners found Mitchell's left thumb print and Solomon's right palm print.

Item 66: Cannabis Product

Item 68: Cannabis Product

Item 72: $980 cash

Item 75: Camouflage hat

39.     SPD Detective Conway concluded in his report that there were twelve apparent bullet defects in the living room of **the residence** which was consistent with the twelve spent cartridge casings recovered from the scene. All of the bullets appeared to have travelled roughly from the direction of the dining room toward the southeast, into the living room. Three of the defects entered the backside of the couch in the living room.

40.     As documented above, several of the evidence items were examined for latent prints. I know based on my training, experience that once a latent print is found on an evidence item, that print can be entered into a Federally maintained database where fingerprint records are kept. Latent prints on items 2, 35, and 62 were identified as belonging to Mitchell. Latent prints on items 12, 49, 60, and 62 were identified as belonging to Solomon. A latent print on item 48 was identified as belonging to Thompson.

41.     I know that based on my knowledge and experience, that latent print identification via federal databases is reliable. Therefore, since Mitchell, Solomon, and Thompson prints were found on evidence items from inside **the residence**, I believe that there is probable cause to believe that the three men were all in **the residence** at some point to make contact with the evidence items. I also know based on my knowledge and experience that DNA profile matches go through a high level of scrutiny before they are confirmed. Consequently, I believe that since multiple DNA profile matches for Thompson were found in **the residence**, there is probable cause to believe that Thompson was one of the three males who was present in **the residence** at the time of the homicide.

Affidavit of SA Kleinosky - 18
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Information provided by Johnson's girlfriend.

2      42.    On November 6, 2022, O.M. was interviewed by investigators. O.M.

3  identified herself as Johnson's girlfriend and had been in a relationship with Johnson

4  since approximately January of 2022. O.M. stated that Johnson had been involved in

5  selling marijuana. On the night of the homicide, Johnson told O.M. that he was going to

6  meet two of his "boys," who O.M. identified as "Sam" and "P." According to O.M.,

7  Johnson had previously provided samples of his marijuana to the men. O.M. believed

8  they had liked the samples, so they were coming to buy from Johnson. Johnson told O.M.

9  that the meet had been planned for possibly two or three weeks. O.M. believed Johnson

10  had been friends with the two since before she and Johnson started dating.

11      43.    O.M. had not met "Sam" or "P" in person but Johnson had shown her a

12  Facebook account for "Sam". O.M. provided investigators a picture of "Sam" wearing a

13  t-shirt that said "King of Kings." O.M. showed a picture of "P" to investigators. The

14  picture was attached to a Facebook account with the name "Pierre Mitchell". O.M.

15  informed investigators that "Sam" also had an Instagram account. "Pierre" and "Sam"

16  were friends on Facebook.

17      44.    During the evening and morning prior to his death, Johnson had been

18  consistent at communicating with O.M. He had told her he arrived at the meet. O.M. felt

19  that something was weird when Johnson went an hour without texting her and then again

20  later when he did not return. O.M. did not know the amount of marijuana Johnson was

21  selling, she thought that the amount may have been around 20 pounds.[6] O.M. felt it was

22  going to be a significant amount since Johnson told her that because of the sale, "he was

23  gonna have a good Christmas." O.M. said the marijuana was usually packaged in bags

24  but she had only seen it in small amounts.

---

[6] Based on the below discussed text message and other content encountered on Johnson's phone, investigators believe that Johnson had access to two different types of marijuana: marijuana grown outdoors, and marijuana grown indoors. The estimated price range between the two was approximately $1,200-1,700 a pound if bought in bulk. Therefore, the estimated worth of 20 pounds of marijuana could have been between $24,00-34,000.

Affidavit of SA Kleinosky - 19
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Information provided by Johnson's mother.

45.    On November 4, 2022, investigators interviewed Johnson's mother, A.B. A.B. informed investigators that Johnson sold marijuana. She stated that he sold "large amounts of weed" and vape oils. Johnson would meet people from other states to sell the marijuana. A.B. believed that Johnson knew the specific person he was meeting up with, that he had known him for approximately two years.

Items seized from of Johnson's Avalanche.

46.    On November 6, 2022, pursuant to King County Superior Court Search Warrant 22-0-62545-0 signed by the Honorable Judge Brian McDonald, investigators searched the gray/champagne 2002 Chevrolet Avalanche belonging to Johnson. The Avalanche was encountered at **the residence** at the time of the crime, seized by SPD, and transported to a secure SPD location for later search. Investigators recovered multiple evidence items to include:

Item 78: Unfired rifle cartridge

Item 79: Wallet with Johnson's ID

Item 80: Cash $121.20

Item 81: Apple iPhone 6

Item 82: Firearms accessories and .45 caliber ammunition

Item 86: Cannabis Extract in a shipping box postmarked for France. Note: The Cannabis Extract was secreted inside of a resealed can of Pedigree dog food.

Item 88: Cannabis extract in a shipping box postmarked for the United Kingdom. Note: The Cannabis Extract was secreted inside of a resealed can of Pedigree dog food.

47.    Based on the aforementioned interviews, investigators believe that Johnson was involved in narcotics trafficking. Both O.M. and A.B. stated that Johnson sold marijuana. A.B. believed that Johnson sold large quantities of Marijuana. O.M. confirmed that Johnson had previously shipped marijuana and O.M. has seen some of the marijuana in small quantities. Johnson told O.M. that he was going to make a large sale on the night of the homicide. O.M. believed that involved multiple pounds of marijuana.

Affidavit of SA Kleinosky - 20
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Johnson informed O.M. that suspects Solomon and Mitchell were coming in from out of town for the purchase.

48.    Further confirmation of Johnson's narcotics trafficking was seen in the shipping packages found in his Avalanche. The cannabis extract (Items 68, 88) were vacuum sealed and resealed in an aluminum dog food can with the paper label reattached. Based on my training and experience, I know that when narcotics traffickers mail narcotics in the mail, they try to conceal it to prevent seizure by law enforcement. I also know based on my training and experience that narcotics traffickers vacuum seal narcotics in an attempt to thwart law enforcement K-9s by preventing the odors of the narcotics from escaping. I also know based on my training and experience that it is common for narcotics traffickers to place narcotics in items that appear unrelated to narcotics, such as a resealed dog food can. This type of concealment is also for the purpose of evading detection by law enforcement.

Search of Johnson's iPhone.

49.    On November 17, 2022, the Honorable Judge Brian McDonald signed King County Superior Court Search Warrant 22-0-62652-9 for evidence Item 81, an Apple iPhone 6. Investigators reviewed the content of the cell phone and determined that the phone belonged to Johnson and was used under phone number 206-422-8797 (x8797). The content of the phone mostly appeared to be dated from 2017 and 2016. Saved on the phone, investigators observed hundreds of images and over a dozen videos containing what appeared to be dried marijuana, marijuana plants, and what appeared to be freshly manufactured hash/hash oil.[7] The images of the hash oil appeared in many forms such as oil, solid, liquid, or wax. Much of the hash was being wrapped or unwrapped with parchments paper. I know based on my training and experience that hash oil contains high levels of THC and is derived from the marijuana plant. It can come in several forms or colors but is often an amber color as seen in the photos on the phone.

---

[7] Hash oil is solid, semi-solid or liquid product made by extracting compounds such a tetrahydrocannabinol (THC) and cannabidiol (CBD) from cannabis. It contains higher concentrations of those compounds and can be consumed through smoking, vaporizing, oral consumption, or topical application.

Affidavit of SA Kleinosky - 21
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

50.     Investigators also observed a series of five photos where large quantities of marijuana were seen stored in clear packaging in boxes surrounded by large black garbage bags. The black garbage bags appeared to be filled with items and labeled. The type of garbage bag was similar to that of the bags that Johnson pulled out of the Avalanche at the time of the homicide. Based on my training and experience, I believe that the black garbage bags look like they are set up to be used as a method of transport for the marijuana once removed from the boxes. I have previously seen marijuana transported in this manner.

51.     Investigators also observed multiple text conversation in Johnson's phone that indicated narcotics trafficking. According to the phone's internal time stamp, on March 31, 2017, at approximately 5:43 pm "Corvette Dude" on phone number 862-505-7167 contacted Johnson on x8797. The following text conversation occurred:

Corvette Dude: Hey

Corvette Dude: I'm in Bellevue I've met with you guys a few times it's the same product right? need clear and pho

Johnson: I mean it's not the same strain from whenever it was we met lol. Your name is?

Corvette Dude: tom from Bellevue I'm not sure if it's the same guy I met the numbers on Craigslist always change I got the black corvette

Johnson: My name is tray. So on hand I have so cheaper product. The better stuff is at the lab near woodinville. I'm going to be going to the gym around 8 I could swing by n pick it up n have you come out

Corvette Dude: do you broker outdoor flower of decent quality I have a big demand for shit around 1200 or less per in 10pack

Corvette Dude: also need qp pho today and 2oz clear

Johnson: I can get some stuff like I'm pretty sure. Just need to contact dude. I'll be in Woodinville around 1-2 today

Corvette Dude: I've been driving all the way go southern oregon for shit like that but last time it was a step below what I'm used to it's gotta have decent nug structure decent nose and I can move a fuckload

Johnson: Hey hey bro

Corvette Dude: yo

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Johnson: Hey waiting on another client that's meeting me in Everett.

2    Johnson: I'll let you know before I leave Everett

3    Johnson: Yo yo

     Johnson: Hey how long till your at target

4    Corvette Dude: I can leave now from Bellevue

5    Johnson: If you could

6    Corvette Dude: 15

7        52.    Based on my training and experience, I know that PHO, is a type of hash

8    oil where propane is used in the cannabinoid extraction process. I also know, based on

9    my training and experience, that cannabis distillate, which is a highly refined and highly

10   concentrated cannabis extract, is often referred to as "the clear." Therefore, I believe

11   when Corvette Dude says he would like "clear and pho," he is referring to two different

12   products, both types of hash oil but varying qualities and concentrations. Corvette Dude

13   then clarified that he wanted a "qp" of pho and "2oz" clear. I know based on my training

14   and experience that "qp" when discussing narcotics typically means the quantity of a

15   quarter pound. Therefore, I believe that Corvette Dude was requesting a quarter pound of

16   PHO and 2 ounces of the distillate.

17       53.    Corvette Dude then indicated that he obtained Johnson's number through

18   an add on Craigslist.  I believe that Johnson confirmed he understands what Corvette

19   Dude was referring to and could obtain what he needed when he replied "So on hand I

20   have so cheaper product. The better stuff is at the lab in Woodinville." I believe that the

     "lab" referred to a location where Johnson obtained his narcotics.

21       54.    I believe when Corvette Dude said: "do you broker outdoor flower of

22   decent quality I have a big demand for shit around 1200 or less per in 10pack," he was

23   asking Johnson if Johnson could sell him 10 pounds of marijuana grown outdoors for

24   $1200 or less a pound. Johnson then confirmed that he thought he could get it. Corvette

25   Dude then stated that he was previously driving to southern Oregon to obtain the

26   narcotics and that he could sell a lot of the narcotics ("move a fuckload"). The two, I

27   believe, then coordinated a meet up to exchange product for money.

Affidavit of SA Kleinosky - 23
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

55.    I believe that this text message conversation indicates that Johnson was using cell phone x8798 to facilitate his drug trafficking operations and conducting drug transactions via text message. The conversation shows that Johnson supplied marijuana, hash oil, and hash oil distillate. The conversation also indicates that Johnson was advertising on the internet via Craigslist. Johnson had multiple text conversations with Corvette Dude, all of which revolved around Johnson supplying Corvette Dude with different variations of cannabis products this included a conversation where Corvette Dude attempts to source another ten pounds of marijuana but grown indoors.

Identification of Samuel Olusegun Solomon.

56.    Investigators obtained a booking photo from Baltimore County, Maryland, associated with the latent print matching Samuel Olusegun Solomon. The photos provided by O.M. of "Sam" appear to match the booking photo of Solomon. Solomon has a distinct mole on his right cheek. Investigators believe that the "Sam" O.M. referred to in her interview and Solomon, whose prints were found in **the residence**, are the same person. Therefore, investigators believe that Solomon was present in **the residence** to conduct a large-scale purchase of narcotics from Johnson.

Identification of Carlton Pierre Mitchell.

57.    Investigators obtained a driver's license photo associated with the latent print match Carlton Pierre Mitchell. The photos of "P" or "Pierre Mitchell" provided by O.M. appear to match the driver's license photo of Mitchell. The photos are clear photos of his face and investigators believe that "P" and Mitchell are the same person. The driver's license photo provided to Airbnb for the rental of **the residence** also matches Mitchell's DOL photos obtained by investigators. Therefore, investigators believe that Mitchell was also present in **the residence** to conduct a large-scale purchase of narcotics from Johnson.

Identification of Aaron Thompson.

58.    Upon the identification of the latent print and DNA match to Aaron Thompson inside **the residence**, investigators obtained a driver's license photo of

Affidavit of SA Kleinosky - 24
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Thompson. Thompson's general appearance is consistent as one of the males seen at **the**

2  **residence** though video is not clear enough to identify him visually.

3  Identification of Solomon's Phone Number.

4  59.    Within **the residence**, investigators found a white paper bag with

5  "www.thereallemonnade.com" and a logo written on the side. The bag contained

6  cigarillos and various marijuana products (Items 66, 68) with store packaging.

7  Investigators determined that the bag was from a cannabis retailer in Portland, Oregon,

   called Lemonnade PDX. Investigators obtained surveillance video from the Oregon State

8  Liquor and Cannabis Commission of the interior and exterior of Lemonnade PDX.

9  60.    On November 2, 2022, at approximately 12:11 p.m., a red Toyota Sienna

10 bearing California license plate 8WJW193 parked in the parking lot near the front door of

11 the store. A male in black pants, a black sweatshirt with the hood up, and white and gray

12 tennis shoes walked from the van into the store. At approximately 12:15 p.m., the male in

13 black can be seen inside the store speaking with the man behind the counter. The man's

14 face can be observed. Investigators believe that the male is Solomon.[8] Solomon can be

15 seen purchasing items consistent with the items found in the bag in the residence; a black

16 container, a blue container, a small silver container, a blue package, a black package, and

17 two long tubular items. Solomon paid for the items in cash which he pulled from a very

18 large stack of bills from his pants pocket.

19 61.    Investigators determined through law enforcement data bases that the van

   was owned by Hertz Rental Car. Investigators contacted Hertz, which informed them that

20 the van had been rented on November 2, 2022, at approximately 11:43 a.m., at the

21 Portland International Airport. The renter of the van was "Olusegun Solomon." Hertz

22 also provided a screen shot of surveillance video footage of the renter. Investigators

23 believe that the male in the screen shot is Solomon.

24

25

26

27 [8] The clothing that Solomon is seen wearing in the Lemonnade PDX video footage is consistent in appearance with the clothing worn by UM3 in the aforementioned video footage.

Affidavit of SA Kleinosky - 25
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

62.      On December 20, 2022, the Honorable Judge Brian McDonald signed King County Superior Court Search Warrant 22-0-62884-0 for Solomon's Hertz rental records for the van and GPS location data for the vehicle. On the rental contract, #983052033, Solomon provided his name as Solomon Olusegun, home address at 19 Oijbway Road, Randallstown, Maryland, phone number "1443622552," and birthdate of 8/1997. The vehicle was returned on November 3, 2022, at 7:12 a.m.

63.      The phone number provided on the contract (1-433-622-552) was not a full phone number. A search of open-source databases showed that phone number 433-622-5523 (TT1) was associated with Solomon. I believe based on my training and experience that it is likely that the final "3" in the phone number from the contract was left off either inadvertently by an employee or purposefully by Solomon.

64.      On February 2, 2023, the Honorable Judge Brian McDonald signed King County Superior Court Search Warrant 23-0-60311-0 authorizing the following for TT1: subscriber and account information, device information, usage information, positioning information such as GPS and Timing Advance, connection records, cellular tower information, and cloud storage information.

65.      TT1 was subscribed to "Olufunmilola R Wolo". Open-source database checks showed that Wolo was also associated with the home address, 19 Oijbway Road, Randallstown, Maryland, the same address that Solomon provided on the Hertz rental contract. Law enforcement database checks indicate that Wolo is Solomon's mother.

66.      On January 29, 2024, the Honorable Mary Alice Theiler, United States Magistrate Judge for the Western District of Washington, signed an order authorizing the installation a Pen Register and Trap and Trace (PRTT) on TT1. The PRTT last showed usage of TT1 on March 24, 2024, leading investigators to believe that Solomon had discontinued use of the phone.

67.      Based on open-source information and law enforcement databases, investigators identified phone number 443-653-7914 (**TT2**) as a new phone number for Solomon. Investigators obtained subscriber and toll information for **TT2** from T-Mobile. The account was activated on November 25, 2022, and subscribed to "Abi Solomon".

Affidavit of SA Kleinosky - 26
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Investigators have determined that Abi Solomon is likely Samuel Solomon's brother. Historical toll information for TT1 and recent toll information for **TT2** show that the top six callers for both phones are the same six phone numbers.

68.    Based on my training and experience, I know that it is common for narcotics traffickers to frequently change phone numbers, and to allow overlap between phones in order to transfer numbers and ensure they have passed on their new number to their customers and suppliers. I also know that narcotics traffickers use phones numbers that are subscribed to other individuals in order to evade detection by law enforcement.

69.    Investigators also obtained recent tolls for the phone number previously discussed to be associated with Mitchell, 323-718-5242 (TT3). **TT2** and TT3 were in contact with each other on March 16, 2024. Further, five separate phone numbers are common contacts for both **TT2** and TT3. I know, based on my training and experience, that though narcotics traffickers change phone numbers, their tolls frequently reflect that they continue to stay in contact with the same numbers as previously contacted on historical phone number.

70.    Accordingly, investigators believe that Solomon is the user of **TT2,** that he has used, is using, and will continue to use **TT2**. The requested GPS location data and Pen Register and Trap and Trace device on **TT2** will aid investigators in locating the whereabouts of **TT2,** to include locations where Solomon may be residing or frequenting for the purposes of contacting Solomon in regard to the above-mentioned crimes.

71.    The search warrant for location data, in conjunction with a pen register and trap and trace device installed on **TT2** will aid investigators by assisting in the location and physical surveillance of Solomon.

### KNOWLEDGE OF CELL PHONE PROVIDERS

72.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity

Affidavit of SA Kleinosky - 27
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers -- as transmitted from a cellular device to a cellular antenna or tower -- can be recorded by pen-traps and indicate the identity of the cellular device making the communication without revealing the communication's content.

73.     Based on my training and experience, I know that when a cell phone connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower, and the cellular antenna or tower records those identifiers as a matter of course. The unique identifiers -- as transmitted from a cell phone to a cellular antenna or tower -- are like the telephone number of an incoming call. They can be recorded by pen-trap devices and indicate the identity of the cell phone device making the communication without revealing the communication's content. In addition, a list of incoming and outgoing telephone numbers is generated when a cell phone is used to make or receive calls, or to send or receive text messages (which may include photographs, videos, and other data). These telephone numbers can be recorded by pen-trap devices and then used to identify the parties to a communication without revealing the communication's contents.

74.     Based my training and experience, I know that a cell phone can also be used to exchange text messages with email accounts. The email addresses associated with those text messages can be recorded by pen-trap devices and then used to identify parties to a communication without revealing the communication's contents.

75.     Based on my training and experience, I know that cellular phones can connect to the internet via a cellular network. When connecting through a cellular network, internet communications sent and received by the cellular phone each contain the same unique identifier that identifies cellular voice communications, such as an ESN, MEIN, MIN, SIM, IMSI, MSISDN, or IMEI. Internet communications from a cellular phone also contain the IP address associated with that cellular phone at the time of the

Affidavit of SA Kleinosky - 28
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

communication. Each of these unique identifiers can be used to identify parties to a communication without revealing the communication's contents.

76. In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that certain providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data (also known as GPS data or latitude-longitude data) and cell-site data (also known as "tower/face information" or cell tower/sector records). E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the cell towers (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

77. Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of **TT2**, including by initiating a signal to determine the location of **TT2** on T-Mobile' network or with such other reference points as may be reasonably available.

78. When using a cellular connection to receive or transmit data, a cellular phone typically utilizes a cell tower to make telephone calls, send or receive text messages, send or receive emails, surf the internet, carry out application initiated data transfers, among other things.

79. Based on my training and experience, I know that T-Mobile can collect cell-site data about **TT2**. Based on my training and experience, I know that for each communication (including data connections) a cellular device makes, its wireless service

provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

80.    Different service providers use different systems, applications, and reports to collect or analyze cell site data. These systems, applications, and reports are referred to by a variety of names including, but not limited to real-time tool or "RTT" (AT&T), Periodic Location Updates or "PLU" (AT&T), per call measurement data or "PCMD" (Sprint PCS), Network Event Location System or "NELOS" (AT&T), EVDO, ALULTE, Timing Advance, and TruCall. RTT data, for example, estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

81.    Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the users of **TT2** and may assist in the identification of co-conspirators and/or victims.

Affidavit of SA Kleinosky - 30
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

82.    Modern cell phones allow users to switch their telephone numbers, use multiple telephone numbers on a single device, and transfer their telephone number to a different cell phone. These changes can be made with the assistance of the wireless provider or by taking actions such as changing the "SIM card" (short for "subscriber identity module card") of a cellphone. To provide for any such changes made to **TT2** Attachment A specifies that the property to be searched includes: (i) any instrument to which the listed target telephone number was assigned within the last 30 days, and that now has been assigned a changed telephone number, (ii) any changed telephone number assigned to an instrument now bearing the same unique identifying number (such as an IMSI, ESN, MSID, or IMEI) as the telephone number listed above, or that was bearing the same unique identifying number as the telephone number listed above, at any point within the last 30 days, (iii) any changed unique identifying number subsequently assigned to the same telephone number, or (iv) any additional changed telephone number and/or unique identifying number, whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the telephone numbers listed above, within the period of disclosure authorized by this warrant.

## AUTHORIZATION REQUEST

83.    Based upon the facts contained in this Affidavit, I submit that probable cause exists to believe that **TT2** is being used by Samuel Olusegun Solomon. I further believe, based on the foregoing toll analysis and electronic communications, that **TT2** is being used by Solomon to communicate with a conspirator in the above discussed crimes. I believe that information obtained from the requested pen register and trap and trace device and real-time GPS location data on **TT2** will be relevant to the ongoing investigation in that it will assist in identifying Solomon's location.

84.    Based on the foregoing, I request that the Court issue the proposed search warrant and pen-trap order, pursuant to Federal Rule of Criminal Procedure 41, 18 U.S.C. § 2703(c), and 18 U.S.C. § 3123.

Affidavit of SA Kleinosky - 31
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

85.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile. I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of **TT2** on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The agency shall reasonably compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

86.     Pursuant to 18 U.S.C. § 2703(g), the government will execute this warrant by serving the warrant on T-Mobile. Because the warrant will be served on T-Mobile, who will then compile the requested records and data, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **TT2** outside of daytime hours.

## REQUEST FOR DELAYED NOTICE

87.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice to the subscribers or user of **TT2** until 90 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or user of **TT2** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as

Affidavit of SA Kleinosky - 32
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is

2  reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. §

3  3103a(b)(2).

**REQUEST FOR SEALING**

4

5        88.    I further request that the Court order that all papers in support of this

6  Application, including the Affidavit, Search Warrant, and Pen/Trap Order, and all related

   documents, be sealed until further order of the Court. These documents discuss an

7  ongoing criminal investigation that is neither public nor known to all of the targets of the

8  investigation. Accordingly, there is good cause to seal these documents because their

9  premature disclosure may seriously jeopardize that investigation.

10

11

12        Allana Kleinosky, Affiant
          Special Agent, FBI

13

14        The above-named agent provided a sworn statement to the truth of the foregoing

15  affidavit by telephone on the 19th day of April, 2024.

16

17

18        PAULA L. McCANDLIS
          United States Magistrate Judge

19

20

21

22

23

24

25

26

27

Affidavit of SA Kleinosky - 33                    UNITED STATES ATTORNEY
USAO 2024R00052                                   700 STEWART STREET, SUITE 5220
                                                  SEATTLE, WASHINGTON 98101
                                                  (206) 553-7970

1

**EXHIBIT 1**

2

3

<u>DECLARATION</u>

4

I, Stephen Hobbs, declare as follows:

5

1.      I am a duly appointed Assistant United States Attorney for the Western

6

District of Washington, and I have primary responsibility for representing the interests of

7

the United States herein.

8

2.      I make this declaration in support of an application for a search warrant

9

pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) with

10

an integrated pen-trap order pursuant to 18 U.S.C. §§ 3122 and 3123.

11

3.      Pursuant to 18 U.S.C. § 3122(b), I certify that the FBI is the law

12

enforcement agency conducting the investigation in this matter and that the information

13

likely to be obtained from the requested warrant is relevant to an ongoing criminal

14

investigation being conducted by that agency.

15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

16

Application is made on the basis of information officially furnished, and on that basis I

17

verily believe such information to be true.

18

Executed this 19th day of April, 2022.

19

20

*s/ Stephen Hobbs*
STEPHEN HOBBS

21

Assistant United States Attorney

22

23

24

25

26

27

28

EXHIBIT 1
Page 1 of 1
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A**

**Property to Be Searched and Subscriber/Subject Information**

Records and information associated with the following cellular telephones

a. **Target Telephone 2 (TT2),** with number 443-653-7914 (hereinafter "**TT2**") with service provided by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey 07054.  The listed subscriber is Abi Solomon and the billing address is 3 Brookeberry Drive, Apartment C1, Nottingham, MD 21236.

In Attachment B, T-Mobile is referred to as the Wireless Provider.

**ATTACHMENT B**

**Particular Things to Be Seized**

This warrant is issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure, the Electronic Communications Privacy Act (ECPA), 18 U.S.C. §§ 2701- 2713, and the Pen Register Act, 18 U.S.C. §§ 3121-3127. As such, this warrant authorizes the collection of subscriber records, pen-trap data, and cell site data information regarding the Target Telephone described in Attachment A. This warrant does not authorize the disclosure or seizure of any tangible property or the content of any wire or electronic communication, as defined in 18 U.S.C. § 2510(8). Accordingly, the Court finds reasonable necessity for the seizure of the data and records identified below. *See* 18 U.S.C. § 3103a(b)(2).

I.     Section I:  **Information to be Disclosed by as the Wireless Provider**

1.     **Subscriber/Account Information.**  The following non-content information about the customers or subscribers associated with the Account listed in Attachment A:

a.     Names (including subscriber names, user names, and screen names);

b.     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

c.     Local and long distance telephone connection records for the last 60 days or two billing cycles, whichever is longer;

d.     Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions for the past 60 days or two billing cycles, whichever is longer;

e.     Length of service (including start date) and types of service utilized;

f.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.      Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.      Means and source of payment for such service (including any credit card or bank account number) and billing records.

2.      **Prospective Cell Site Location Information.**

a.      All information about the location of the Target Telephone described in Attachment A for **a period of 45 days from activation**, during all times of day and night.  This information includes: precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A**.**

3.      **Prospective E-911/GPS and Cell Site Triangulation Information.**

a.      All information about the location of the Target Telephone described in Attachment A for **a period of 45 days**, during all times of day and night.  This information includes: all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone(s) or account(s) described in Attachment A.

b.      The physical address and coverage maps of cell towers used by the Target Telephone described in Attachment A.

To the extent that the location information described in the previous paragraphs (hereinafter, "Location Information") is within the possession, custody, or control of the Wireless Provider. The Wireless Provider is required to disclose the Location Information to the government pursuant to this warrant.  In addition, pursuant to 18 U.S.C. §§ 3123(b)(2) and 3124(a)-(b), the Wireless Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Wireless Provider's services.  The government shall compensate the Wireless Provider for reasonable expenses incurred in

Attachment B
Page 2 of 3
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

furnishing such facilities or assistance.

**II.    Section II:  Information to Be Seized by the Government**

1.      All information described above in Section I that will assist in investigating unidentified subjects who are engaged in violating 21 U.S.C. §§ 841(a)(1), and 846.

2.      All non-content subscriber/account information provided pursuant to 18 U.S.C. § 2703(c).

3.      Location Information regarding the Target Telephone described in Attachment A.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Wireless Provider in order to locate the things particularly described in this Warrant.

Attachment B
Page 3 of 3
USAO 2024R00052

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970